❒ Original

**CLERK'S OFFICE**
**A TRUE COPY**
Sep 18, 2020
s/ Jeremy Heacox
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| A black/silver LG phone currently located at 2620 W. Wisconsin Ave, Milwaukee, WI, more fully described in Attachment A | ) ) ) ) |

Case No. **20-M-402 (SCD)**

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ Eastern _____ District of _____ Wisconsin _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before October 2, 2020
_____ *(not to exceed 14 days)*
❒ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Stephen C. Dries _____ .
*(United States Magistrate Judge)*

❒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial) and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❒ for _____ days *(not to exceed 30)*   ❒ until, the facts justifying, the later specific date of _____ .

Date and time issued:      9-18-20. 12:30 pm            *(signature)*
_____            _____
                                                             *Judge's signature*

City and state:      Milwaukee, WI            Stephen C. Dries, U.S. Magistrate Judge
_____            _____
                                                             *Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

The property to be searched is described as a black/silver LG phone, hereinafter referred to as "**Device**."

The **Device** is currently located at 2620 West Wisconsin Avenue, Milwaukee, Wisconsin.

This warrant authorizes the forensic examination of the **Device** for the purpose of identifying the electronically stored information described in Attachment B.

1

## ATTACHMENT B

1.     All records on the **Device** described in Attachment A that relate to violations of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Sections 922(g) and 924(c), and involve Jeffrey Jones, a/k/a Jeffery Jones, including, but not limited to:

    a. lists of customers and related identifying information;

    b. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

    c. any information related to sources of firearms and drugs and co-conspirators (including names, addresses, phone numbers, or any other identifying information);

    d. any information recording schedule or travel;

    e. all bank records, checks, credit card bills, account information, and other financial records;

    f. Photographs and/or videos depicting possesson of drugs or firearms;

    g. Any evidence related to either the ownership, purchase, or possession of drugs or firearms; and

    h. Records of Internet activity, including browser history, search terms that the user entered into any Internet search engine, and records of user-typed web addresses

2.     Evidence of user attribution showing who used or owned the **Device** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

1

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

2



# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

A black/silver LG phone currently located at 2620 W. Wisconsin Ave, Milwaukee, WI, more fully described in Attachment A

)
)
)
)
)

Case No. **20-M-402 (SCD)**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the **Eastern** District of **Wisconsin** , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution of and possession with intent to distribute controlled substances |
| 18 U.S.C. §§ 922(g) & 924(c) | Felon in possession of a firearm |
| | Possessing a firearm in furtherance of a drug trafficking crime |

The application is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Christopher Farrell, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ Telephone _____ *(specify reliable electronic means).*

Date: **9—18—20**

*Judge's signature*

City and state: **Milwaukee, Wis**

Stephen C Dries Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Christopher Farrell, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation and have been since August of 2008. I have been assigned to the Southeastern Wisconsin Regional Gang Task Force since September of 2019. I was previously assigned to the Louisville and Pittsburgh Field Offices. Prior to being employed with the FBI, I was a police officer for approximately six and a half years. I am an investigator or law enforcement officer of the United States within the meaning of 18 U.S.C. Section 2510(7), in that I am empowered by the law to conduct investigations of and to make arrests for federal felony arrests.

3.      As a Special Agent, I have attended training courses that specialized in the investigation of narcotics trafficking and money laundering. I have also participated in the investigation of narcotics-related offenses, resulting in the

1

prosecution and conviction of individuals and the seizure of illegal drugs, weapons, United States currency, and other evidence of criminal activity. Additionally, I have spoken with other experienced narcotics investigators on numerous occasions concerning the method and practices of drug traffickers and money launderers. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become aware of the methods used by drug traffickers to manufacture, smuggle, safeguard, and distribute narcotics, and to collect and launder trafficking-derived proceeds. I am also familiar with the actions, habits, traits, methods, and terminology used by the traffickers and abusers of controlled substances. More specifically, I am familiar with the street names of various drugs, including marijuana, heroin, cocaine, and cocaine base. I am familiar with methods that are commonly used by drug dealers to package and prepare controlled substances for sale in the State of Wisconsin and elsewhere.

    4.    As a narcotics investigator, I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover operations, court-ordered wiretaps, analysis of phone and financial records, and the arrests of numerous drug traffickers. I have worked with numerous informants in the investigation of drug trafficking in the State of Wisconsin and elsewhere. I have directed informants during controlled buys of controlled substances, performed undercover meetings with individuals, and made monetary payments to drug traffickers for past controlled substances received. I have

2

participated in the execution of numerous state and federal search warrants in which controlled substances, drug paraphernalia, drug proceeds, drug-related records, financial records, and electronic devices with data were seized. I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such. I also know that it is common for drug traffickers to use their vehicles to store, secrete, and otherwise possess various indicia of drug trafficking. I have also been the affiant of many search warrants. I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding acquisition, sale, importation, manufacture, and distribution of controlled substances.

5. In the course of my employment and experience, I have also become aware of techniques and practices used by narcotics traffickers to avoid detection by law enforcement. Examples of those techniques include the use of multiple locations to conduct narcotics related activities, the use of counter-surveillance, the use of hidden compartments in vehicles to conceal narcotics and currency, the use of mobile telephones, voice mail, texting, instant messaging, email, the compartmentalized use of multiple telephones, and the use of numerous associates and "workers" to further their criminal organization. I have also become aware of the various techniques individuals use to conceal the source or nature of drug proceeds. Examples of those techniques include the purchase of assets and financial

3

instruments in nominee names using cash and "structuring" transactions to avoid certain reporting requirements of financial institutions.

6.      Based upon my training and experience, I know that computer hardware and software may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime, and/or (2) the objects may have been used to collect and store information about crimes (in the form of electronic data). Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware and software which are (1) instrumentalities, fruits, or evidence of crime, or (2) storage devices for information about crime.

7.      To this end, based upon my training and experience, I know that individuals involved in drug trafficking frequently use cellular telephones to maintain contact and arrange transactions with their sources and customers of and co-conspirators in the distribution of controlled substances. I have also found it very common for crime suspects to use their cellular telephones to communicate aurally or via electronic message in "text" format with individuals whom they purchase, trade, or otherwise negotiate to obtain illegal drugs. I also believe that it is common for crime suspects who possess illegal controlled substances and firearms to often take or cause to be taken photographs and other visual depictions of themselves, their associates, and the illegal controlled substances and firearms that they control, possess, buy, and sell.

4

8.     The facts in this affidavit come my personal observations, my training and experience, my review of oral and written reports of other law enforcement officers participating in this and related investigations, records, documents, and other evidence obtained during this investigation. The investigation to date has involved traditional law enforcement methods, including, but not limited to confidential informants, interviews, documentary evidence, phone analysis, physical surveillance, and search warrants.

9.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

10.     The property to be searched is described as a black/silver LG Phone, hereinafter refered to as "**Device**."

11.     The **Device** is currently located at 2620 West Wisconsin Avenue, Milwaukee, Wisconsin.

12.     The applied-for warrant would authorize the forensic examination of the **Device** for the purpose of identifying electronically stored data more particularly described in Attachment B.

## PROBABLE CAUSE

13.     On five separate dates between February 2020, and July 2020, a confidential informant acting at the direction and control of law enforcement

5

purchased heroin, fentanyl, and methamphetamine from JEFFREY R. JONES, a/k/a JEFFERY R. JONES. To arrange the purchases, the confidential informants called JONES at his known cellular telephone numbers. On July 15, 2020, United States Magistrate Judge Nancy Joseph issued a criminal complaint and arrest warrant for JONES based upon his drug trafficking activity. On July 27, 2020, law enforcement officers arrested JONES and located the **Devices** on his person and/or in his vehicle at the time of arrest.

A. **CS #1 Purchased Narcotics from JONES**

14.     In January 2020, case agents interviewed a confidential source (CS #1). CS #1 stated "R.J." is a Gangster Disciple gang member who is selling heroin and fentanyl. CS #1 indicated CS #1 purchased narcotics from R.J. in the past and would be able to purchase narcotics again from R.J. CS #1 indicated R.J. drives a black Nissan Maxima with Illinois plates. CS #1 indicated R.J. was currently in possession and known to use phone number (414) 810-9473, the 9473 Phone, to facilitate illegal narcotics transactions. A case agent showed a single Milwaukee Police Department booking photograph of JEFFREY R. JONES, a/k/a JEFFERY R. JONES, (date of birth: XX/XX/1984) to CS #1. CS #1 positively identified the photograph as the person CS #1 knew as "R.J."

15.     On February 3, 2020, case agents interviewed CS #1 again. CS #1 stated CS #1 has purchased fentanyl from JONES since 2015. CS #1 has purchased a minimum of 10 grams of fentanyl at least 40 times since 2015. CS #1 advised CS

#1 has purchased 70 grams of fentanyl between seven and eight times. Overall, CS #1 believed CS #1 purchased half a brick, or half of a kilogram, of pure fentanyl from JONES since 2015. CS #1 advised JONES has been using the 9473 Phone for the last three to four years.

16. Case agents believe CS #1 is reliable and credible. First, CS #1 has provided information and cooperated with law enforcement since October 2019. Second, CS #1's information is consistent with case agent's knowledge of violent gang subjects in Milwaukee, Wisconsin. Furthermore, substantial portions of CS #1's information has been corroborated in other gang investigations by controlled drug purchases, consensually recorded phone calls, as well as through independent investigation, including surveillance and information from other sources. CS #1 is cooperating with law enforcement to obtain consideration from the Milwaukee County District Attorney's Office related to narcotics trafficking convictions. CS #1 is a convicted felon with prior obstruction, carrying a concealed weapon, and possession and distribution of narcotics convictions. For these reasons, case agents believe CS #1 to be reliable.

**B.    JONES Uses his Cellular Phones to Sell Narcotics**

17. On February 8, 2020, March 14, 2020, May 1, 2020, May 26, 2020, and July 8, 2020, CS #1 purchased, under the direction and control of case agents, narcotics from JONES.

7

18. Based upon my training and experience, I know that a "controlled buy" (and/or controlled contact) is a law enforcement operation in which a confidential source purchases drugs from a target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When a confidential source is used, s/he is searched for contraband, weapons, and money before the operation. The confidential source is also wired with a concealed body recorder and monitoring device. When the transaction is completed, the confidential source meets cases agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The confidential source is again searched for contraband, weapons, and money. A sample of the suspected drugs is then field tested by case agents for the presence of controlled substance and then placed in inventory pursuant to normal inventory procedures. Telephone calls to the target by the confidential source are consensually recorded calls under the direction and control of case agents and made in the presence of case agents.

### 1. February 3, 2020, Controlled Purchase of Heroin

19. On February 3, 2020, CS #1 arranged to purchase heroin from JONES. CS #1 advised CS #1 was successful in setting up a heroin purchase of approximately 45 grams for $4,100 from JONES. CS #1 advised JONES was waiting for CS #1 to call him to meet and conduct the transaction. CS #1 made a consensually recorded phone call to the 9473 Phone, and JONES answered the

8

phone. CS #1 and JONES discussed meeting, and JONES told CS #1 to meet him at the Popeye's restaurant located at 1567 W. National Avenue in Milwaukee, Wisconsin. Next, case agents provided CS #1 with a recording device and a total of $4,100 pre-recorded money for the controlled purchase. Case agents established surveillance in the area and observed CS #1 park in the parking lot. Case agents observed JONES arrive in the parking lot driving a Nissan Maxima and park behind CS #1. CS #1 entered JONES' vehicle from the front passenger side and then exited shortly thereafter. JONES was then observed exiting his vehicle and approaching CS #1 at CS #1's vehicle and engage in what appeared to be a verbal confrontation. JONES then returned to his vehicle and left the parking lot.

20.    Case agents met and debriefed CS #1 after the narcotics purchase from JONES. Case agents seized the suspected heroin and the recording devices. CS #1 indicated CS #1 arrived in the parking lot and called JONES at the 9473 Phone to notify him that CS #1 was waiting in the parking lot. CS #1 observed JONES arrive in the parking lot in the black Nissan Maxima and entered the front passenger seat of JONES' vehicle. CS #1 provided JONES $4,100 in cash, and JONES handed a clear plastic sandwich bag from the center cup holder containing a grey rock-like substance. CS #1 exited the vehicle and returned to CS #1's vehicle when JONES approached CS #1's driver side door. JONES was upset because he believed CS #1 owed him $300. JONES then returned to his vehicle and left the parking lot. CS #1 believed JONES was keeping narcotics at a nearby storage unit because it takes

9

JONES a longer amount of time to arrive at a narcotics transaction when he lives very close. JONES also told CS #1 he had to go out of town, which CS #1 believed meant that JONES needed to get more narcotics, most likely from Chicago or Detroit.

21.     Case agents field tested the suspected heroin, which yielded positive results for the presence of heroin and fentanyl, and weighed approximately 44.22 grams. A case agent reviewed the video of the narcotics transaction and determined it was consistent with CS #1's statements regarding the narcotics transaction. A case agent also positively identified JONES as the individual who met CS #1 in the parking lot to conduct the narcotics transaction.

## 2.     March 14, 2020, Controlled Purchase of Fentanyl

22.     On March 14, 2020, CS #1 arranged to purchase fentanyl from JONES. CS #1 advised CS #1 was successful in setting up a $2,000 fentanyl purchase from JONES. CS #1 attempted to make a consensually recorded phone call to the 9473 Phone, but JONES did not answer. Moments later, CS #1 received a phone call from JONES. During the consensually recorded phone call, CS #1 and JONES discussed meeting, and JONES told CS #1 to meet him at the Popeye's restaurant located at 1567 W. National Avenue in Milwaukee, Wisconsin. Next, case agents provided CS #1 with a recording device and a total of $2,000 pre-recorded money for the controlled purchase, and then established surveillance in the area of 1567 W. National Avenue in Milwaukee, Wisconsin. Case agents observed CS #1 park in the

10

parking lot. After almost 40 minutes, case agents observed JONES arrive in the parking lot driving a dark colored Audi and park behind CS #1. JONES exited the front driver side of the Audi and entered CS #1's front passenger side. Moments later, JONES exited CS #1's vehicle, returned to his vehicle, and left the parking lot.

23.     Case agents met and debriefed CS #1 after the narcotics purchase from JONES. Case agents seized the suspected fentanyl and the recording devices. CS #1 indicated CS #1 contacted JONES via phone and notified him CS #1 was waiting at the meet location. CS #1 stated CS #1 received a text message from JONES, using the 9473 Phone, stating that JONES was on his way and that he'd be there shortly. CS #1 observed JONES arrive in the parking lot in an unknown vehicle and enter CS #1's front passenger seat. JONES removed the fentanyl from his front right pant pocket and placed it near the center console as CS #1 provided $2,000 in cash to JONES. CS #1 stated JONES exited the vehicle and entered the vehicle that he parked behind CS #1 and leave.

24.     Case agents field tested the suspected fentanyl, which yielded positive results for the presence of fentanyl, and weighed approximately 10.03 grams. The fentanyl was double bagged, meaning it was packaged in two sandwich bags. Based on my training and experience, I believe that this suggests JONES is aware of the fatal effects fentanyl may have if touched or inhaled. A case agent reviewed the video of the narcotics transaction and determined that it was consistent with CS

11

#1's statements regarding the narcotics transaction. A case agent also positively identified JONES as the individual who met CS #1 in the parking lot to conduct the narcotics transaction.

### 3. May 1, 2020, Controlled Purchase of Heroin

25.     On May 1, 2020, CS #1 arranged to purchase heroin from JONES for $4,500. At the direction of case agents, CS #1 made a consensually recorded phone call to the 9473 Phone, and JONES answered the phone. CS #1 and JONES discussed meeting to purchase controlled substances, and JONES told CS #1 to meet him at the McDonald's restaurant located at 1575 W. Washington Street in Milwaukee, Wisconsin. Next, case agents provided CS #1 with a recording device and a total of $4,500 pre-recorded money for the controlled purchase. Case agents established surveillance in the area of 1575 W. Washington Street in Milwaukee, Wisconsin.

26.     Case agents conducted surveillance and observed a white Infinity XQ80 parked outside the address of 1522 W. Orchard Street, Milwaukee. Case agents observed the white Infinity XQ80 leave the address and maintained surveillance of the vehicle until it arrived and parked outside the address of 824 S. 18th Street, Milwaukee, Wisconsin JONES' residence. Case agents observed JONES exit the white Infinity XQ80 and enter 824 S. 18th Street, Milwaukee. A few minutes later, case agents observed JONES exit 824 S. 18th Street, Milwaukee and enter the front passenger side of a silver Hyundai, which was parked in front of

12

824 S. 18th Street, Milwaukee. The silver Hyundai left the address and arrived at 1522 W. Orchard Street, Milwaukee. Case agents then observed JONES exit the silver Hyundai and enter 1522 W. Orchard Street, Milwaukee, while the Hyundai was waiting outside. Moments later, JONES exited 1522 W. Orchard Street, Milwaukee, and re-entered the silver Hyundai.

27.     Case agents conducted surveillance in the area of the buy location, the McDonald's restaurant located at 1575 W. Washington Street, and observed CS #1 arrive at the location. Case agents further observed the silver Hyundai arrive at the location of the McDonald's restaurant. Case agents observed what appeared to be two suspected hand-to-hand narcotics transactions take place, neither of which involved CS #1. The first transaction involved an unknown white male who approached the passenger side of the Hyundai and conducted a hand-to-hand transaction, and the second transaction involved an unknown black male who approached the front passenger door of the Hyundai momentarily and then left on foot. Without meeting with CS #1, the silver Hyundai left the location and traveled back to 824 S. 18th Street, Milwaukee, at which time case agents observed JONES exit the silver Hyundai, retrieve an item from the mailbox, and re-enter the vehicle. The silver Hyundai left the area traveling east on W. National Avenue.

28.     Case agents communicated with CS #1, who indicated the transaction would be delayed about one hour or so. During this time, case agents were notified through court authorized warrants of "ping" locations for the 9473 Phone that

13

JONES traveled south towards Chicago and was not within the Milwaukee City limits. Specifically, the 9473 Phone showed connections to towers located in the area of 16598 W. Cherrywood Lane, Wadsworth, Illinois at 3:27 p.m., and in the area of 1212 W. Grande Avenue, Chicago, Illinois at 4:09 p.m.

29.     Upon learning that JONES was delayed, CS #1 departed the meet location. However, while in route, CS #1 received a phone call from JONES, who stated he would have his brother conduct the narcotics transaction. Accordingly, CS #1 returned to the meet location and parked at address 1565 W. Scott Street facing east. JONES notified CS #1, via phone call and text messages that his brother would arrive shortly at the location driving a Red Monte Carlo.

30.     After approximately thirty minutes, at approximately 3:29 p.m., case agents observed a Red Monte Carlo drive to and park directly behind CS #1's vehicle. Case agents observed CS #1 exit the vehicle and approach the front passenger door of the Red Monte Carlo. CS #1 opened the front passenger door and reached into the vehicle. Moments later, CS #1 returned to CS #1's vehicle. Case agents observed the Red Monte Carlo leave the location going east on W. Scott Street.

31.     Case agents met with and debriefed CS #1 after the narcotics purchase from JONES' brother. Case agents seized the suspected heroin and the recording devices. CS #1 provided the following information. CS #1 indicated CS #1 arrived in the parking lot and attempted to contact JONES multiple times to notify JONES

14

that CS #1 was waiting in the parking lot. CS #1 received a text message from JONES stating he would be there in one hour or so. CS #1 talked to JONES over the phone where JONES stated he was trying to get a hold of his brother to conduct the drug transaction and would be driving a red Chevrolet Monte Carlo. CS #1 told JONES where CS #1 was parked. CS #1 observed the red Chevrolet Monte Carlo arrive and park behind CS #1's vehicle. CS #1 approached the passenger door of the red Chevrolet Monte Carlo and observed JONES' brother in the driver seat and an unknown black male in the front passenger seat. CS #1 opened the passenger door and leaned into the vehicle. CS #1 provided JONES' brother the pre-recorded $4,500 in cash, and JONES' brother pulled a clear plastic bag containing a light gray powdery/chunky-like substance and handed it to CS #1. CS #1 returned to his/her vehicle and the red Chevrolet Monte Carlo left the area.

32.    A field test revealed that the substance obtained from JONES' brother yielded positive results for the presence of heroin, methamphetamine, and fentanyl, and weighed approximately 51.8 grams. Audio and video of the controlled purchase was reviewed and determined to have captured only part of the transaction. A review of the existing video was determined to be consistent with CS #1's statements regarding the attempt to meet with JONES to conduct the narcotics transaction. Additionally, the observations made by case agents throughout the narcotics transactions with JONES' brother appeared to be consistent with the CS #1's statements.

15

### 4.     May 26, 2020, Controlled Purchase of Heroin

33.     On May 26, 2020, CS #1 arranged to purchase heroin from JONES. Case agents met with CS #1, who advised CS #1 had been in contact with JONES and indicated CS #1 would be purchasing ten grams of heroin in the future. CS #1 made a consensually recorded phone call to the 9473 Phone, and JONES answered the phone. CS #1 and JONES discussed meeting today and CS #1 asked JONES to meet in five minutes, which JONES acknowledged. CS #1 stated CS #1 didn't need to confirm the location as it was predetermined to be at McDonalds, located at 1575 W. Washington Street, Milwaukee, Wisconsin.

34.     Case agents provided CS #1 with a recording device and a total of $850 of pre-recorded money for the controlled purchase. Case agents established law enforcement teams for surveillance at three locations: 824 S. 18th Street, Milwaukee, JONES' residence; 1522 W. Orchard Street, Milwaukee, JONES' stash apartment; and McDonalds located at 1575 W. Washington Street, Milwaukee, Wisconsin.

35.     At approximately 12:20 p.m., surveillance observed JONES leave 824 S. 18th Street, Milwaukee, and enter a gray Infiniti parked in the driveway. At approximately 12:36 p.m., and before the arrival of CS #1, surveillance observed JONES arrive at the McDonalds located at 1575 W. Washington Street. Surveillance observed JONES exit the vehicle and an unidentified white female enter the front passenger seat. JONES returned to the vehicle and shortly

16

thereafter the female left the vehicle. JONES then left the area, and at approximately 12:40 p.m., JONES arrived back at 824 S. 18th Street, Milwaukee. Case agents believe that this interaction between JONES and the unidentified female is consistent with a drug transaction.

36.    At approximately 12:49 p.m., CS #1 arrived at the McDonalds. JONES was observed entering and exiting 824 S. 18th Street, Milwaukee, between 12:40 p.m. and 1:06 p.m. At approximately 1:06 p.m., CS #1 contacted JONES at the 9473 Phone, and JONES asked if CS #1 was at the McDonalds. CS #1 confirmed, and JONES indicated he was on his way.

37.    At approximately 1:10 p.m., surveillance observed JONES enter the gray Infiniti and leave 824 S. 18th Street, Milwaukee. At approximately 1:14 p.m., surveillance observed JONES arrive at 1522 W. Orchard Street, Milwaukee, and enter the front door. At approximately 1:28 p.m., CS #1 contacted JONES at the 9473 Phone, and JONES told CS #1 he would be there in a few seconds. At approximately 1:34 p.m., surveillance observed JONES exit the front door of 1522 W. Orchard Street, Milwaukee, and enter the gray Infiniti.

38.    At approximately 1:35 p.m., surveillance observed JONES arrive at the McDonalds operating the gray Infiniti. Surveillance observed CS #1 enter the front passenger seat, close the door, and then subsequently exit the vehicle. Moments after CS #1 left the vehicle, an unidentified white male entered the front passenger seat of the vehicle. Case agents believe that this interaction between JONES and

17

the unidentified male is consistent with a drug transaction. At approximately 1:36 p.m., CS #1 began to leave the parking lot of the McDonalds.

39.     Case agents met and debriefed CS #1 after the narcotics purchase from JONES. Case agents seized the suspected heroin and the recording devices. CS #1 indicated CS #1 arrived in the parking lot and attempted to make contact with JONES three times and eventually received a call from JONES. In this call, JONES confirmed CS #1 was at the McDonalds and indicated he would be there shortly. After continuing to wait, CS #1 was able to contact JONES again, who indicated he would be there in a few seconds. CS #1 observed a gray Infiniti arrive at the location, at which time CS #1 entered the front passenger seat. CS #1 observed JONES was the driver and the sole occupant of the vehicle. CS #1 observed approximately 10 grams of heroin on JONES' lap. CS #1 also observed a large clear sandwich bag containing approximately 30 grams of heroin individually packaged in small amounts on the driver's seat tucked near JONES' groin area. JONES handed CS #1 the narcotics as CS #1 provided the money to JONES. CS #1 exited the vehicle and believed another narcotics transaction was about to occur with a white male. CS #1 indicated JONES frequently "lines up" multiple customers at one time.

40.     Case agents field tested the suspected heroin, which yielded positive results for the presence of heroin, fentanyl, and methamphetamine, and weighed approximately 10 grams. A case agent reviewed the video of the narcotics

18

transaction and determined it was consistent with CS #1's statements regarding the narcotics transaction.

### 5. July 8, 2020, Controlled Purchase of Heroin

41.     On July 8, 2020, CS #1 arranged to purchase heroin from JONES. Case agents met with CS #1, who advised CS #1 had been in contact with JONES and indicated CS #1 would be purchasing ten grams of heroin in the future. CS #1 made a consensually recorded phone call to the 9473 Phone, and JONES answered the phone. CS #1 and JONES discussed meeting, and JONES told CS #1 to meet at McDonalds, which is known to CS #1 to be the McDonald's located at 1575 W. Washington Street, Milwaukee, Wisconsin. CS #1 made a second consensually recorded phone call to the 9473 Phone, and JONES answered the phone. CS #1 asked JONES how far away JONES was, and JONES replied that he was a couple of minutes out. JONES then confirmed that CS #1 wanted "ten," known to CS #1 to be ten grams of heroin.

42.     Case agents provided CS #1 with a recording device and a total of $700 of pre-recorded money for the controlled purchase. Case agents established law enforcement teams for surveillance at three locations: 824 S. 18th Street, Milwaukee, JONES' residence; 1522 W. Orchard Street, Milwaukee, JONES' apartment; and McDonalds located at 1575 W. Washington Street, Milwaukee, Wisconsin.

19

43. At approximately 4:46 p.m., case agents observed a white Dodge Caravan with Colorado registration plates AZFE20 park in a lot to the west of 1522 W. Orchard Street, Milwaukee. Within a minute, case agents observed JONES, wearing a black short sleeve shirt, black and gray shorts, and black shoes, exit the driver door of the white Dodge Caravan. Case agents observed JONES walk in the direction of the rear entrance door of 1522 W. Orchard Street, Milwaukee. However, agents were not in position to see the rear door. At approximately 5:02 p.m., case agents, who had repositioned themselves, observed JONES exit the rear door of 1522 W. Orchard Street, Milwaukee. Case agents observed JONES, wearing a white and red backpack strapped on his back, walk to the white Dodge Caravan, open the driver door, remove the backpack, and place the backpack inside the vehicle. Then, case agents observed JONES enter the white Dodge Caravan and drive southbound through the parking lot, east on W. Orchard Street, and then north on S. 15th Street.

44. At approximately 5:07 p.m., CS #1 arrived at the McDonalds. Case agents observed CS #1 exit CS #1's vehicle, walk towards JONES' white Dodge Caravan, and enter the front passenger seat. At approximately 5:09 p.m., case agents observed JONES exit the white Dodge Caravan, get back in CS #1's vehicle, and leave the area. Simultaneously, case agents observed the white Dodge Caravan traveling west on W. Scott Street and then north onto S. Cesar E. Chavez Drive.

20

Case agents in the area positively identified the driver of the white Dodge Caravan as JONES.

45.     At approximately 5:12 p.m., case agents observed the white Dodge Caravan stop in front of the 824 S. 18th Street, Milwaukee, momentarily before driving to a nearby gas station, where JONES filled up with gas. JONES then momentarily stopped in the parking lot of the Popeyes located at 1567 W. National Avenue. At approximately 5:24 p.m., case agents observed the Dodge Caravan parked in the driveway of 824 S. 18th Street, Milwaukee.

46.     At approximately 5:28 p.m., case agents met and debriefed CS #1 after the narcotics purchase from JONES. Case agents seized the suspected heroin and the recording devices. CS #1 indicated CS #1 drove to the McDonalds located at 1575 W. Washington Street and parked on the south side of the street, south of the McDonalds parking lot. CS #1 stated JONES called CS #1 as CS #1 arrived and asked where CS #1 was parked. CS #1 told JONES CS #1 was parked on the street and not in the McDonalds parking lot. CS #1 stated JONES arrived in a white van on the north side of the street. CS #1 exited CS #1's vehicle and entered the front passenger seat of the van. CS #1 stated JONES already had the suspected narcotics in his hand and provided it to CS #1. CS #1 provided JONES with the $700 in pre-recorded cash. CS #1 stated CS #1 exited the van and re-entered CS #1's vehicle.

21

47.     Case agents field tested the suspected heroin, which yielded positive results for the presence of heroin and fentanyl, and weighed approximately 10 grams. A case agent reviewed the video of the narcotics transaction and determined it was consistent with CS #1's statements regarding the narcotics transaction.

### C.     CS #2 Purchased Narcotics from JONES

48.     On March 5, 2020, case agents conducted surveillance of JONES at 824 S. 18th Street, Milwaukee. Case agents have observed JONES at this residence frequently. On this date, case agents observed JONES exit 824 S. 18th Street, Milwaukee and enter a red Chevrolet Camaro bearing Michigan plate DRW6101. Case agents surveilled JONES as he met with an individual in the parking lot of an IHOP Restaurant located at 1110 Miller Park Way, Milwaukee, Wisconsin. Case agents observed the male at the driver's side window speaking to JONES and then walk away from the vehicle holding a bag. Case agents located the individual in a McDonald's located next to the IHOP Restaurant. The individual went to the restroom for approximately 45 minutes, leading case agents to believe the individual was involved in suspicious activity. Once the individual left McDonald's, the Milwaukee Police Department conducted a field interview of the individual. The individual was identified and later determined to be CS #2. During the interview, CS #2 admitted to having a quantity of heroin inside the backpack that CS #2 had just purchased. Located inside the backpack was, among other items, a small clear

22

plastic container with suspected heroin. CS #2 was arrested by Milwaukee Police Department for possession of narcotics.

49.    CS #2 was transported to a Milwaukee Police Department District. CS #2 waived CS #2's *Miranda* rights and provided the following information. CS #2 admitted to buying heroin from an individual CS #2 knows as "R.J." before being stopped by the police. CS #2 contacted R.J. via (414) 639-2843, the 2843 Phone, and arranged to meet to purchase a quantity of heroin at the McDonald's located on Miller Parkway. R.J. arrived in a red Chevrolet Camaro and there was an unknown female in the passenger seat. CS #2 gave R.J. $140 for approximately one gram of heroin. CS #2 believed CS #2 has purchased heroin from R.J. on three dozen occasions, usually in the amount of one gram per transaction. CS #2 indicated R.J. is known to operate multiple vehicles during drug transactions, including the red Camaro.

50.    A case agent showed a single Milwaukee Police Department booking photograph of JEFFREY R. JONES, a/k/a JEFFERY JONES, (date of birth: XX/XX/1984) to CS #2. CS #2 positively identified the photograph as the person CS #2 knew as "R.J."

51.    On March 19, 2020, case agents interviewed CS #2. CS #2 stated that CS #2 has previously purchased heroin from R.J. using the 2843 Phone.

52.    Case agents believe CS #2 is reliable and credible. First, CS #2 has provided information and cooperated with law enforcement since March 2020.

23

Second, CS #2's information comes from CS #2's personal involvement with JONES and is consistent with case agent's knowledge of JONES and JONES' narcotics trafficking activities in Milwaukee, Wisconsin. CS #2's information about CS #2's trafficking relationship is also corroborated by the controlled buys that CS #1 conducted with JONES. CS #2 is cooperating with law enforcement to obtain consideration from the Milwaukee County District Attorney's Office for charges related to possession of narcotics. CS #2 is a convicted felon with convictions for maintaining a drug trafficking place, manufacturing/delivering THC, resisting or obstructing an officer, aggravated battery, probation violation, and disorderly conduct. For these reasons, case agents believe CS #2 to be reliable.

53.     On April 8, 2020, CS #2 conducted a consensually recorded phone call to discuss a future narcotics transaction with JONES. CS #2 made a consensually recorded phone call to the 2843 Phone, and JONES answered the phone. CS #2 asks JONES if he is still serving during the pandemic, and JONES says he has been waiting for CS #2 to call. CS #2 indicated that CS #2 wanted a "whole," referring to one gram of heroin. JONES says alright and provides a location to meet.

54.     Case agents debriefed CS #2 after the consensually recorded phone call with JONES. CS #2 stated CS #2 usually buys one-half of a gram or one gram of heroin from JONES at a time and pays $140 for one gram of heroin. CS #2 stated CS #2 did not think JONES would actually deliver the narcotics. Case agents believe JONES would not drive to the location to conduct the narcotics transaction

24

due to it being located outside of Milwaukee County. The controlled buy for one gram of heroin did not subsequently occur.

**D.    JONES' Arrest**

55.     On July 27, 2020, law enforcement observed JONES leave his residence and drive away in a vehicle. To effectuate JONES' arrest, law enforcement stopped JONES. Upon JONES' arrest, officers located approximately 14.17 grams of methamphetamine on JONES' person and approximately $61 in his possession. Officers also located four cellular telephones. Jones had three phones on his person and one phone in his vehicle at this time.

**E.    Search of JONES' Residence - 824 S. 18th Street, Milwaukee**

56.     On July 27, 2020, law enforcement officers searched JONES' residence, 824 S. 18th Street, Milwaukee, Wisconsin, pursuant to a federal search warrant. Upon execution of the search warrant, officers located the following: two loaded semi-automatic pistols, a loaded revolver, an extended Glock magazine, approximately 50 rounds of ammunition, approximately 26.5 grams of marijuana, and approximately $12,978 in U.S. Currency.

**F.    Search of JONES' Stash Apartment - 1522 W. Orchard Street, Apartment 9, Milwaukee**

57.     On July 27, 2020, law enforcement officers searched JONES' stash apartment, 1522 W. Orchard Street, Apartment 9, Milwaukee, Wisconsin, pursuant

25

to JONES' written consent. Upon the search, officers located the following[1]: five firearms, including 3 semi-automatic pistols, and two semi-automatic rifles; approximately 1,062.7 grams of methamphetamine in a kitchen cabinet, digital scales, a box of sandwhich bags, a substance weighing 42.2 grams that tested positive for the presence of opiates, a Pyrex measuring cup containing approximately 2.7 grams of methamphetamine, hundreds of rounds of ammunition, at least 8 magazines, an M16 style magazine speed loader, guns boxes, a gun lock, a gun holster, a shotgun pump handle, bottles containing hydrocodone, an assortment of pills, approximately 459.1 grams of marijuana edibles, and the **Device**. The **Device** was located in a cabinet between the kitchen and dining room of JONES' stash apartment. Notably, JONES appears to have changed the locks on his stash apartment, and the inside of the entry door appeared to have been fortified.

## CONCLUSION

58.     Through affiant's training, experience and discussions with other experienced law enforcement officers, affiant is familiar with the ways in which drug traffickers conduct their unlawful trade, including their methods of distribution, their use of communication devices, their use of coded communications to conduct their transactions, the employment of counter surveillance, their use of

---

[1] What follows is not an exhaustive list of all items located during the search.

26

false or fictitious identities, and their use of various forms of electronic devices to store and/or conceal illegal activity.

59. Based upon my training and experience, affiant knows that individuals involved in drug trafficking frequently use cellular telephones to maintain contact and arrange transactions with their sources and customers of and co-conspirators in the distribution of controlled substances. Affiant has also found it very common for crime suspects to use their cellular telephones to communicate aurally or via electronic message in "text" format with individuals whom they purchase, trade, or otherwise negotiate to obtain illegal drugs.

60. Based on my training and experience, affiant is aware that individuals involved in trafficking controlled substances often possess multiple cellular devices to compartmentalize their illegal activity and to avoid law enforcement detection.

61. Based upon my training and experience, affiant believes it is common for crime suspects who possess illegal controlled substances and firearms to often take or cause to be taken photographs and other visual depictions of themselves, their associates, and the illegal controlled substances and firearms that they control, possess, buy, and sell; furthermore, affiant believes it is common for these photographs and visual depictions to be kept and maintained on their cellular devices.

62. Based upon the facts described above, I believe that JONES used his cellular phones to facilitate controlled substances transactions, and evidence of drug

27

trafficking may likely be stored and recorded on the **Device**. More particularly, I believe that there is probable cause to believe that a search of the information contained within the above described **Device** will produce evidence of a crime, namely evidence related to the possession and trafficking of controlled substances, as well as the possession of firearms.

63.     The **Device** was seized by Federal Bureau of Investigation Special Agents and Milwaukee Police Department Task Force Officers during a search of JONES' stash apartment upon his consent.

64.     The **Device** is currently in storage at 2620 West Wisconsin Avenue, Milwaukee, Wisconsin.  In my training and experience, I know that the **Device** has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as it was when the **Device** first came into law enforcement's possession.

## III.     TECHNICAL TERMS

65.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications,

28

wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such

29

navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

30

g.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

66.     Based on my training, experience, and research, I know that the **Device** has the capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA, and all have the ability to access the internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

## IV.    ELECTRONIC STORAGE AND FORENSIC ANALYSIS

67.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

31

68. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Device** was used, the purpose of its use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the **Device** because:

i. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

j. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

k. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

l. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

32

m. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

69. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Device** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the **Device** to human inspection in order to determine whether it is evidence described by the warrant.

70. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

71. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **Device** described in Attachment A to seek the items described in Attachment B.

33

## ATTACHMENT A

The property to be searched is described as a black/silver LG phone, hereinafter referred to as "**Device**."

The **Device** is currently located at 2620 West Wisconsin Avenue, Milwaukee, Wisconsin.

This warrant authorizes the forensic examination of the **Device** for the purpose of identifying the electronically stored information described in Attachment B.

1

**ATTACHMENT B**

1.      All records on the **Device** described in Attachment A that relate to

violations of Title 21, United States Code, Section 841(a)(1), and Title 18, United

States Code, Sections 922(g) and 924(c), and involve Jeffrey Jones, a/k/a Jeffery

Jones, including, but not limited to:

   a. lists of customers and related identifying information;

   b. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   c. any information related to sources of firearms and drugs and co-conspirators (including names, addresses, phone numbers, or any other identifying information);

   d. any information recording schedule or travel;

   e. all bank records, checks, credit card bills, account information, and other financial records;

   f. Photographs and/or videos depicting possesson of drugs or firearms;

   g. Any evidence related to either the ownership, purchase, or possession of drugs or firearms; and

   h. Records of Internet activity, including browser history, search terms that the user entered into any Internet search engine, and records of user-typed web addresses

2.      Evidence of user attribution showing who used or owned the **Device** at

the time the things described in this warrant were created, edited, or deleted, such

as logs, phonebooks, saved usernames and passwords, documents, and browsing

history.

1

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

2